Nos. 12-2229, 12-2231, 12-2276

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

————————————

UNITED STATES,
                    Plaintiff-Appellee

v.

CATHERINE FLOYD,
                    Defendant-Appellant

————————————

UNITED STATES,
                    Plaintiff-Appellee

v.

WILLIAM SCOTT DION,
                    Defendant-Appellant

————————————

UNITED STATES,
                    Plaintiff-Appellee

v.

CHARLES ADAMS,
                    Defendant-Appellant

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

————————————

CONSOLIDATED BRIEF FOR THE APPELLEE

————————————

KATHRYN KENEALLY
  *Assistant Attorney General*

FRANK P. CIHLAR                          (202) 514-5396
  *Chief, Criminal Appeals &*
  *Tax Enforcement Policy Section*
GREGORY VICTOR DAVIS                      (202) 514-5396
DAMON WILLIAM TAAFFE                      (202) 514-5396
  *Attorneys, Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
CARMEN M. ORTIZ
  *United States Attorney*

# TABLE OF CONTENTS

**Page**

Table of contents..................................................................i

Table of authorities ...........................................................v

Reasons why oral argument should be heard........................vii

Jurisdictional statement ...................................................2

Statement of the issues ....................................................2

Statement of the case .......................................................3

Statement of the facts ......................................................5

    A.   The investigation, searches, and seizures ....................6

        1.   2003 Postal Search of 44 Depot Street and Mailbox No. 5 ....................................................6

        2.   2003 Postal Search of 18 Wendy Lane .................9

        3.   2004 IRS Search of 18 Wendy Lane ...................11

        4.   Search of 22 Madison Street..............................13

    B.   The offense conduct.......................................14

        1.   The payroll tax conspiracy..................................15

            a.   Contract America......................................15

            b.   Talent Management and New Way...........17

        2.   The warehouse banking conspiracy....................17

        3.   Individual offenses.............................................19

    C.   The trial, and sentences..............................................20

        1.   Pretrial motions.................................................20

            a.   Motions to suppress .................................20

            b.   Motions to sever.......................................22

        2.   Trial, convictions, and sentences.......................22

Summary of argument ......................................................................24
Argument..........................................................................................28
I........................................................................................................28

    The district court correctly found that there was sufficient
        evidence to support the jury's verdicts against Floyd
        and Dion ................................................................................28

    Standard of review ...............................................................28

        A.    The evidence proved that Floyd and Dion
                participated in the payroll conspiracy.........................29

        B.    The evidence proved that Floyd and Dion
                participated in the warehouse banking
                conspiracy...................................................................35

        C.    The evidence proved that Floyd and Dion each
                corruptly endeavored to obstruct the IRS ..................39

II .....................................................................................................42

    The district court correctly admitted evidence obtained
        during searches of defendants' properties............................42

    Standard of review ...............................................................42

        A.    The district court properly admitted evidence
                obtained during the search of 44 Depot Street ...........42

        B.    The district court properly admitted evidence
                obtained during the 2003 search of 18 Wendy
                Lane............................................................................45

        C.    The district court properly admitted evidence
                obtained during the 2004 search of 18 Wendy
                Lane............................................................................46

        D.    The district court properly admitted evidence
                obtained during the search of 22 Madison Street .......49

III ....................................................................................................52

The district court correctly denied Floyd and Dion's motions to sever their trials from that of Adams, an alleged co-conspirator charged in the same indictment. ........................52

Standard of review ...............................................................52

A.    Severance is virtually never required in the context of an alleged conspiracy. ..................................54

B.    This unexceptional case provides no occasion to depart from the joint-trial presumption. .....................55

IV ........................................................................................58

The district court correctly rejected Dion's and Floyd's motions to dismiss one count of the indictment on the ground that the IRS had not issued implementing regulations. ...........................................................................58

Standard of review ...............................................................58

V ..........................................................................................60

Dion's sentence reflected no unwarranted disparity. ....................60

Standard of review ...............................................................60

VI .........................................................................................63

The district court reasonably issued cautionary instructions during Adams's testimony and properly instructed the jury with respect to Adams's "good faith" defense. ..............63

Standard of review ...............................................................63

A.    The district court's instructions during Adams's testimony were necessary and proper, and they allowed Adams to testify without confusing the jury as to the law .........................................................64

B.     The final jury instructions properly presented
        and allowed the jury to acquit on Adams's
        claimed "good faith" defense ........................................ 67

Conclusion ............................................................................... 69
Certificate of compliance ........................................................ 70
Certificate of service .............................................................. 71

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**:

Drumgold v. Callahan, 707 F.3d 28 (1st Cir. 2013)................................57

Zafiro v. United States, 506 U.S. 534 (1993) ..........................................55

United States v. Allen, 670 F.3d 12 (1st Cir. 2012)................................63

United States v. Bowers, 920 F.2d 220 (4th Cir. 1990)........................59

United States v. Brennick, 134 F.3d 10 (1st Cir. 1998) ..................58, 62

United States v. Burgos, 703 F.3d 1 (1st Cir. 2012)..............................31

United States v. Caceres, 440 U.S. 741 (1979) ......................................51

United States v. Camacho, 661 F.3d 718 (1st Cir. 2011) ......................42

United States v. Catalan-Roman, 585 F.3d 453 (1st Cir. 2009)............54

United States v. Cirilo-Munoz, 504 F.3d 106 (1st Cir. 2007)................63

United States v. De La Paz-Rentas, 613 F.3d 18 (1st Cir. 2010).....52, 53

United States v. Flores-Machicote, 706 F.3d 16 (1st Cir. 2013) ...........62

United States v. Flores-Rivera, 56 F.3d 319 (1st Cir. 1995) .................55

United States v. Gonzalez, 570 F.3d 16 (1st Cir. 2009) .............63, 66-68

United States v. Hensel, 699 F.2d 18 (1st Cir. 1983) ............................51

United States v. Huezo, 546 F.3d 174 (2d Cir. 2008) ......................30, 50

United States v. Leahey, 434 F.2d 7 (1st Cir. 1970) .............................51

United States v. Leon, 684 F.3d 897 (1984)...........................................52

United States v. Moran, 312 F.3d 480 (1st Cir. 2002).....................28, 29

United States v. Natanel, 938 F.2d 302 (1st Cir. 1991) .......................58

United States v. Page, 521 F.3d 101 (1st Cir. 2008) ........................54, 61

United States v. Peters, 153 F.3d 445 (7th Cir. 1998) ..........................50

United States v. Rodrigue, 560 F.3d 29 (1st Cir. 2009) ........................48

United States v. Rose, 104 F.3d 1408 (1st Cir. 1997)............................56

United States v. Saunders, 553 F.3d 81 (1st Cir. 2009)........................54

United States v. Schiefen, 139 F.3d 638 (8th Cir. 1998) ......................59

United States v. Strickland, 245 F.3d 368 (4th Cir. 2001)....................30

United States v. Thurston, 544 F.3d 22 (1st Cir. 2008) .......................60

United States v. Torres, 604 F.3d 58 (2d Cir. 2010)..............................30

United States v. Torres-Maldonado, 14 F.3d 95 (1st Cir. 1994) ...........56

United States v. Tzolov, 642 F.3d 314 (2d Cir. 2011)......................33, 36

United States v. Walls, 546 F.3d 728 (6th Cir. 2008).............................59

United States v. Yefsky, 994 F.2d 885 (1st Cir. 1993) ...........................56

**STATUTES**:

18 U.S.C. § 1028(a) ..................................................................44
18 U.S.C. § 3231 ......................................................................2
18 U.S.C. § 371 ........................................................... 4, 5, 29, 53
18 U.S.C. § 3742(a) ...................................................................2
18 U.S.C. §§ 1341 .....................................................................6
26 U.S.C. § 6103 .....................................................................51
26 U.S.C. § 7201 ...................................................................4, 5
26 U.S.C. § 7203 ......................................................................5
26 U.S.C. § 7206(1) ...................................................................5
26 U.S.C. § 7212(a) .............................................................passim
26 U.S.C. § 7608(a) ..................................................................49
28 U.S.C. § 1291 ......................................................................2
44 U.S.C. § 1505(a) ..............................................................27, 59

**MISCELLANEOUS**:

Fed. R. App. P. 32(a)(5) .............................................................69
Fed. R. App. P. 32(a)(6) .............................................................69
Fed. R. App. P. 32(a)(7)(B) ..........................................................69
U.S.S.G. § 2T4.1 .....................................................................61

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

Counsel for the government believe that oral argument would assist the Court in this matter because of its unusual complexity and the large number of issues raised by the three co-defendants.

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————————

## No. 12-2229

### UNITED STATES,
#### Plaintiff-Appellee

v.

### CATHERINE FLOYD,
#### Defendant-Appellant

————————————

## No. 12-2231

### UNITED STATES,
#### Plaintiff-Appellee

v.

### WILLIAM SCOTT DION,
#### Defendant-Appellant

————————————

## No. 12-2276

### UNITED STATES,
#### Plaintiff-Appellee

v.

### CHARLES ADAMS,
#### Defendant-Appellant

————————————

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

————————————

## CONSOLIDATED BRIEF FOR THE APPELLEE

————————————

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction over this criminal matter pursuant to 18 U.S.C. § 3231.  The district court entered final judgments against defendants Catherine Floyd and William Scott Dion on October 2, 2012, and against Charles Adams on October 19, 2012. (F.Add. 1; D.Add. 1; A.Add. 1).[1]  Those judgments disposed of all claims of all parties.  Defendants filed timely notices of appeal.  (App. 12 (Floyd, filed Oct. 11, 2012); D.Add. 16 (Dion, filed Oct. 11, 2012); A.App. 161 (Adams, filed Oct. 22, 2012).)  This Court has jurisdiction over defendants' appeals under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court correctly found that there was sufficient evidence to support the jury's verdicts of guilty on all counts with respect to all defendants.

---

[1] Throughout this brief, "F.Br." and "F.Add." will refer to Floyd's opening brief and addendum thereto, respectively; "D.Br." and "D.Add." will refer to Dion's opening brief and addendum thereto, respectively; and "A.Br." and "A.Add." will refer to Adams's opening brief and addendum thereto, respectively.  In addition, "App." will refer to the Consolidated Appendix filed by Floyd and Dion, "A.App." will refer to the Appendix filed by Adams, and "Supp.App." will refer to the Supplemental Appendix filed by the government.

2.  Whether the district court correctly denied motions to suppress evidence obtained during searches conducted pursuant to duly issued warrants.

3.  Whether the district court correctly denied Floyd's and Dion's motions to sever their trials from that of Adams, an alleged co-conspirator charged in the same indictment.

4.  Whether the district court correctly rejected Floyd's and Dion's motions to dismiss one count of the indictment on the ground that the IRS had not issued implementing regulations.

5.  Whether Dion's sentence was reasonable compared to those of his co-conspirators, some of whom pled guilty.

6.  Whether the district court reasonably issued cautionary instructions during Adams's testimony and properly instructed the jury with respect to Adams's "good faith" defense.

## STATEMENT OF THE CASE

In August 2009, the grand jury charged defendants Floyd, Scott, and Adams, along with co-conspirators Gail and Myron Thorick and

customers Gary and Kenneth Scott Alcock, with operating and participating in a corrupt scheme to defraud the IRS. (App. 14-58.)

Count One charged Floyd, Dion, and Adams with conspiring to defraud the IRS, in violation of 18 U.S.C. § 371, by operating and promoting a payroll tax scheme that used a multitude of trusts and corporations to help client companies and their employees avoid detection by the IRS. (App. 8-12.) Count Two charged Floyd and Dion with conspiring to defraud the IRS, in violation of 18 U.S.C. § 371, by operating a warehouse banking scheme in which defendants assisted customers in concealing financial transactions, assets, and income from the IRS. (App. 13-20.) Counts Four and Five, respectively, charged Dion and Floyd with corruptly endeavoring to obstruct the due administration of the Internal Revenue Laws, in violation of 26 U.S.C. § 7212(a), by concealing their income through participation in the warehouse banking scheme. (App. 27-30.) Finally, Counts Six, Seven, and Eight charged Adams with tax evasion, in violation of 26 U.S.C. § 7201, for years 1996, 2003, and 2004, respectively.

Following a jury trial (Saylor, J., presiding), the court sentenced Floyd to 60 months' imprisonment and ordered her to pay $3 million in

-5-

restitution.  (F.Add. 1-7.)  It sentenced Dion to 84 months'

imprisonment and ordered him to pay $3 million in restitution.  (D.Add.

1-7.)  And the court sentenced Adams to 48 months' imprisonment and

ordered him to pay $400,001 in restitution.  (A.Add. 1-7.) [2]

Defendants filed timely notices of appeal.  They challenge their

convictions and sentences.

## STATEMENT OF THE FACTS

Consistent with their longstanding affiliation with a tax-defier

organization to which they pledged to "resist[] and delay[] the tyrant at

every step" (Supp.App. 38, 42), defendants were convicted of leading a

massive conspiracy to hide millions of dollars of income from the IRS.

The investigation that uncovered evidence of defendants' tax crimes

---

[2] Counts 3 and 9-20 variously charged Gail Thorick, Myron
Thorick, Gary Alcock, and Kenneth Scott Alcock with conspiracy, in
violation of 18 U.S.C. § 371, tax evasion, in violation of 26 U.S.C.
§ 7201, failure to file a return, in violation of 26 U.S.C. § 7203, and
filing a false return, in violation of 26 U.S.C. § 7206(1).  The defendants
in those counts pleaded guilty prior to trial.  Gary Alcock was sentenced
to 14 months' imprisonment (App. 386-388); Kenneth Scott Alcock was
sentenced to a term of imprisonment of 12 months and 1 day (App. 390);
and Gail Thorick was sentenced to 7 months' imprisonment (App. 391-
392).  Myron Thorick pleaded guilty to four counts but received no
prison sentence.  (App. 393-394.)  None of these defendants has
appealed his or her sentence.

started as something quite different, however: an investigation into the illegal manufacture and fraudulent sale of false identification documents.

## A.    The investigation, searches, and seizures

Much of the evidence against defendants was obtained through searches conducted pursuant to six warrants, each of which defendants challenged at trial.

### 1.    2003 Postal Search of 44 Depot Street and Mailbox No. 5

On January 13, 2003, the U.S. Postal Inspection Service executed search warrants at 44 Depot Street in Uxbridge, Massachusetts, which covered offices and a mailbox (No. 5) at that address.   (Collectively, the "44 Depot Street warrants.")  The warrant applications were supported by the affidavit of Inspector Regina Faulkerson, which articulated grounds for probable cause to believe that Dion was committing violations of 18 U.S.C. §§ 1341 (Mail Fraud), 1342 (Fictitious Name or Address), and 1343 (Wire Fraud), and that evidence of each crime would be found at 44 Depot Street.

The Faulkerson affidavit explained that a company named PT Resource Center, which listed its address as 44 Depot Street, stated on

its website that it made "camouflage ID cards" for a fee and produced

such personal identification cards "for any country on earth." (App. 65

¶ 8.)[3]  The website particularly promoted PT Resource's ability to

produce International Driver Permits (IDPs) that allegedly "conform[ed]

to every requirement under the convention[s]" governing such

documents, and that were "produced and provided under and in

compliance with" those conventions.  (*Id.* at ¶ 9.)  But some of PT

Resources's representations were too good to be true.  For example, PT

Resources promised that that the IDPs it produced "CANNOT be

assessed points, revoked or suspended."  (*Id.* at ¶ 10.)

As the Faulkerson Affidavit explained, these representations were

false.  The affidavit recounted statements by a host of government

officials establishing that, within the United States, only the American

Automobile Association is authorized to issue IDPs.  (*Id.* at ¶ 11.)  Those

officials also made it clear that, contrary to PT Resources's false

representations, even a valid IDP cannot insulate a driver from the

-------

[3] The evidence at trial suggested that PT Resource Center also did
business as PT Resources.  See, *e.g.*, App. 64 at ¶ 4.  No matter of
consequence turns on the distinction between those entities, if any
exists, and this brief will treat them as synonymous.

legal consequences of driving with a suspended or revoked license, nor can it prevent points for traffic violations from being assessed.  (*Id.* at ¶¶ 11-13.)

The Postal Inspection Service's investigation tied both Dion and Floyd to PT Resources's fraudulent activities.  A postal carrier stated that he routinely delivered mail addressed to PT Resources and Dion to 44 Depot Street; the carrier also stated that a sign at that address identified PT Resources and Dion as using the premises.  (*Id.* ¶¶ 30, 33.) Moreover, Dion had previously executed an affidavit under oath stating that he conducted business in the name of various entities – including PT Resources and a second company called Mountain Management – at 44 Depot Street.  (*Id.* ¶¶ 6-7.)  Mountain Management, which turned out to be a front company for defendants' warehouse banking conspiracy, provided the link to Floyd.  When the Postal Inspection Service conducted an undercover purchase of fictitious identification documents from PT Resources and sent its payment to 44 Depot Street, that payment was deposited into a bank account held in the name of

Mountain Management.  (*Id.* ¶¶ 16-20.)[4]  The signature card for

Mountain Management identified Floyd as one of the signatories, and

Worcester County police identified Floyd as Dion's girlfriend.  (*Id.* at

¶ 20.)

Relying on these facts and others included in the Faulkerson

Affidavit, Magistrate Judge Swartwood issued search warrants for 44

Depot Street and Mailbox No. 5 at that address.   (App. 62.)

### 2.    2003 Postal Search of 18 Wendy Lane

On the same morning that postal inspectors executed the warrant

at 44 Depot Street, other postal inspectors, including Inspector

Faulkerson, visited Dion and Floyd at their home at 18 Wendy Lane,

Uxbridge, Massachusetts.  (App. 87 at ¶ 5.)  Dion invited the inspectors

in and agreed to be interviewed.  He stated that he owned and operated

a business known as Office Services from 18 Wendy Lane.  (App. 87-88

at ¶ 7.)  Office Services, he said, contracted with an individual named

---

[4] In a parallel investigation, the FTC executed an undercover
purchase of one fictitious identification document from PT Resource
Center.  The payment the FTC submitted was also deposited into the
Mountain Management bank account.  (Id. ¶¶ 21-23.)

Donald Glessner to receive mail for PT Resources at 44 Depot Street, and to forward it to another address.  (*Ibid.*)  Dion refused, however, to provide a signed contract with Glessner, to provide contact information for Glessner, or to discuss the work that Office Services did for other entities.  (*Ibid.*)

During the interview, Dion identified a room in the house as his office.  That room contained a computer that, Dion said, he used in connection with PT Resources.  Dion stated that he had encrypted the hard drive when he saw the Postal Inspectors approaching.  (*Ibid.*)  The office also contained a safe and large filing cabinet.  (*Ibid.* at ¶ 9.)  Inspectors observed Floyd retrieve materials labeled "Office Services" from the filing cabinet, and also receive cash from several individuals who came to the residence during their interview of Dion.  (*Id.* at ¶ 7-9.)

Based on these facts and those set forth in Inspector Fulkerson's affidavit concerning 44 Depot Street, Magistrate Judge Swartwood authorized the inspectors to search 18 Wendy Lane for documents related to the production of IDPs and other identification documents, as well as invoices and financial records concerning PT Resources and Mountain Management, among other entities.  (App. 85-90.)  The

warrant also authorized the search of the computer, safe, and filing cabinet that the inspectors had seen in plain view during their interview with Dion.  (*Id.* at 90.)

### 3.    2004 IRS Search of 18 Wendy Lane

As it turned out, the Postal Investigative Service was not the only government agency investigating Floyd and Dion's criminal activities. In 2002, the Internal Revenue Service's Criminal Investigation Division began investigating Floyd and Dion's involvement in numerous schemes to assist others in evading taxes, using the United States mail system. (App. 98 ¶6.)  Many of the items seized from 18 Wendy Lane in 2003 proved material to that parallel investigation.  (*Id.* at ¶ 5.)

In 2004, IRS Special Agent David Toy sought and obtained a warrant to conduct a second search of the house at 18 Wendy Lane, this time with a focus on Floyd's and Dion's conspiracy and tax offenses. (App. 95-148.)  Toy's affidavit explained that, through an entity named Contract America, Floyd and Dion had conspired to assist client businesses with impermissibly reclassifying employees as non-covered contract workers.  (App. 98 ¶ 3.)  By funneling payments through defendants' entities rather than paying their *de facto* employees

directly, the clients were able to evade payroll and unemployment taxes, and their employees were able to evade federal personal income taxes. (*Id.* at ¶¶ 8-9.) Toy's affidavit set forth extensive evidence tying Dion and Floyd not only to Contract America, but also to a host of other entities that they appeared to use to further assist their tax evasion scheme. (App. 98-123.)

Some of the evidence described in Toy's affidavit was obtained during the 2003 search of 18 Wendy Lane. Such items included, *inter alia,* a Quickbooks Report listing checks for "contract labor" that appeared to evince a scheme like Contract America's, under the closely related name of "American Contracting Services" (App. 103 at ¶ 8); documents demonstrating that Floyd and Dion had opened accounts with a bank in American Somoa under the name of Mountain Management (App. 23 at ¶ 52); and a business card for Contract America bearing the name of Charlie Adams, a co-defendant in this case who was suspected of being one of Floyd's and Dion's co-conspirators in the payroll scheme. (App. 102 ¶17.)

Much of the evidence to support the 2004 warrant application, however, was not connected to the the 2003 search. Such evidence

linked Dion, Floyd, and Adams to the Save-A-Patriot Fellowship (SAP), a tax-defier organization (App. 124-125 at ¶¶ 71-74), and to a warehouse banking scheme whereby payments to employees were hidden from the IRS (App. 106-112 at ¶¶ 29-35). Some documentary evidence was collected from a trash search at 18 Wendy Lane (App. 104 at ¶¶ 23-24), while other documents were obtained by more traditional means, including subpoena (App. 108 at ¶ 31).

In reliance on Toy's affidavit, which included insights drawn from his training and experience investigating tax crimes and tax defiers, Magistrate Judge Dein found probable cause and authorized a second search of 18 Wendy Lane on March 29, 2004. (App. 94.) The list of items to be seized was extensive and specific. (App. 142-145.)

### 4.    Search of 22 Madison Street

Also in March 2004, agents from the IRS Criminal Investigation Division executed a search warrant at Adams's home, located at 22 Madison Street, Wrentham, Massachusetts. This warrant application was also supported by an affidavit from Special Agent Toy, who articulated grounds for believing that Adams and his then-wife, Marie, were complicit with Floyd and Dion in the Contract America payroll

-14-

scheme and related efforts.  (A.App. 89-139.)   A material portion of the

evidence supporting the warrant application was obtained in the 2003

search of 18 Wendy Lane (A.App. 5), but other evidence was obtained

independently, including through a trash collection at 22 Madison

Street (A. App. 44).  The affidavit also noted Adams's past assertions of

unspecified constitutional rights in refusing to comply with

administrative summonses, as well as his ongoing involvement in the

Save-A-Patriot tax-defier organization.  (A.App. 36-38.)

## B.    The offense conduct

Defendants conspired to create, promote, and manage two related

schemes to obstruct the IRS.  In the first scheme, defendants created a

network of corporate entities whose primary purpose was to assist

client companies and individuals employed by those companies to evade

payroll and personal income taxes by impermissibly treating the

workers as independent contractors.  In the second, Floyd and Dion

created a warehouse banking scheme in which clients' funds were

untraceably commingled, thereby frustrating any IRS attempt to track

income and expenses.

1. **The payroll tax conspiracy**

   a. **Contract America**

In the normal payroll arrangement, an employer withholds a percentage of each employee's wages in order to pay the employee's Social Security, Medicare, and income taxes.  Each quarter, the employer pays over those withheld taxes to the IRS on behalf of each employee, using a Form 941.  Each year, the employer provides employees with Forms W-2 reporting the amounts earned and withheld, and also provides a copy of each Form W-2 to the IRS.  This arrangement ensures that the IRS is apprised of each employer's and employee's income and tax liabilities, and enables the IRS to begin the audit process to enforce the tax laws when necessary.

The defendants here conspired to subvert the reporting process by developing a payroll system hidden from IRS view.  They accomplished this by creating Contract America, a company that interposed itself between employers and employees and left no paper trail.  In exchange for a percentage fee, Contract America received payments from employers and used those funds to pay employees "under the table," *i.e.*, without properly withholding and paying over to the IRS the required payroll taxes.  The employees' income was likewise hidden from the

IRS, as Contact America generated no pay stubs or Forms 941 or 1099. The end result was that, in exchange for its fee, Contract America enabled employers and willing employees to evade all taxation. Defendants' advertisements left no doubt that they intended Contract America to subvert the law. *See* Supp.App. 24 (Contract America brochure asking, "Would you like to take home up to 100% of your next paycheck?" and urging businesses to "[m]otivate your workers with a huge 10% raise at no additional expense!").

Each defendant had a material role in Contract America, and each benefitted from its illegal activities. Dion formulated the scheme and transferred clients to Contract America from a predecessor company. Floyd, who served as its president, treasurer, secretary, and director. (Supp.App. 77), also opened bank accounts on the company's behalf (Supp.App. 171) and provided her signature stamp for Marie Adams to use on all outgoing checks (Supp.App. 171; Supp.App. 15). Charles Adams promoted the scheme and aggressively sought out new clients. All three defendants profited by sharing in the percentage fee that Contract America charged to process each paycheck. (Supp.App. 171.)

From 2001 to 2004, hundreds of deposits were made into Contract America's bank accounts, and thousands of paychecks were issued and drawn on those accounts. The government calculated the resulting tax loss to be $2.8 million. (Supp.App. 88.)

### b.  Talent Management and New Way

Defendants realized that Contract America's *raison d'etre* – to allow businesses to pay employees without taxation or documentation – meant that it could not operate alone; certain law-abiding employees wished to receive W-2s and pay taxes. Defendants therefore created Talent Management and New Way as "on the books" alternatives to Contract America. Those employees seeking documentation would be paid through Talent Management or New Way, which withheld taxes and created and filed Forms 941, W-2, and 1099-MISC as required by law. (Supp.App. 168.) As with Contract America, however, the identity of the employer was hidden from the IRS; the employer was listed as "Talent Management" or "New Way," even though the work was performed for the client company. (Supp.App. 175.)

### 2.  The warehouse banking conspiracy

Floyd and Dion also participated in a second conspiracy designed to obstruct the IRS: they created a series of front companies including

Your Virtual Office (YVO), Office Services, Financial Factors, and

Mountain Management, into which Floyd and Dion deposited client

funds, which they then paid out at the clients' direction, but under the

front company's name. (Supp.App. 180.) These front companies served

no legitimate purpose; on the contrary, as Floyd and Dion said in an

advertisement for Business Management Systems (BMS), which they

used to create and support other front companies for clients' use, the

entities were designed to ensure that "the government doesn't know –

indeed, it cannot know! – who's who and what's what." (Supp.App. 30.)

BMS was a second layer of concealment Floyd and Dion offered

clients. For example, Scott Alcock testified that BMS created ScottCo,

listing him as just a 1/2 percent owner, when in reality he controlled

100 percent of the company. (Supp.App. 172-73; Supp.App. 1-4.) Alcock

sent his income from a trucking business he owned to ScottCo, and

Floyd and Dion deposited that money into the warehouse banking

system, minus their fee. (Supp.App. 173.) Alcock would then retrieve

cash each week from defendants' office. Similarly, Steven Savage

testified that Floyd created a trust on his behalf, and then prepared

minutes for a trustees' meeting that never took place. (Supp.App. 185; Supp.App. 83.)

Floyd's and Dion's resolve to obstruct the IRS was undeterred even when it became clear that they were under investigation. When the IRS searched Floyd's and Dion's Wendy Lane home in January 2004, defendants simply transferred the warehouse scheme's assets from Office Services, whose records the IRS seized during that search, to Calico Enterprises. (Supp.App. 186.) The reason for Floyd's and Dion's resolve to continue the conspiracy was clear: it was highly lucrative. They charged substantial fees for their services, including two percent on all deposits, two dollars for each check sent on a client's behalf, and three percent on all cash disbursed. (Supp.App. 169-70.) Customers paid these substantial fees because defendants' warehouse banking scheme enabled the customers to vanish from the IRS's view.

### 3.    Individual offenses

In addition to their participation in the conspiracies, all three defendants also committed individual tax offenses. As described above, Floyd and Dion earned substantial fee income from the warehouse banking scheme, income on which they evaded taxes by leaving their

monies commingled with clients' funds in the warehouse accounts and

issuing checks drawn on the warehouse accounts to pay their personal

expenses.  Adams failed to file federal income tax returns for 1996,

2003, and 2004 (Doc. 2 at 125), and he caused his income from Contract

America for those years to be directed to nominee corporations (Exs.

465-I, 465-J, 465-K, and 465-R).  Adams also made extensive use of cash

and money orders to pay his expenses.  (Supp.App. 131-145.)

## C.    The trial, convictions, and sentences

### 1.    Pretrial motions

#### a.    Motions to suppress

Prior to trial, Floyd and Dion filed motions to suppress evidence

obtained pursuant to the search warrants executed at Dion's office on

Depot Street, and at Floyd and Dion's Wendy Lane home.  (App. 59, 82,

91; D.Add. 11.)  These motions argued that there was no probable cause

to support the searches, as no law forbade the manufacture of "novelty"

identification documents, and that there was insufficient nexus with the

Wendy Lane house.  (*Ibid.*)  Adams also filed a motion to suppress

evidence obtained pursuant to the search warrant executed at his

Madison Street home, arguing that the Toy Affidavit failed to establish

probable cause and that IRS agents had illegally carried firearms while conducting the search.  (A.App. 65.)

The district court denied the motions to suppress in an oral ruling. (F.Add. 8-20; A.App. 182-189.)  With respect to the search of the Depot Street office, the court found that there had been probable cause to conclude that PT Resources had fraudulently represented the validity of the false identifications it produced and that there was a sufficient nexus with that location.  (F.Add. 8-10.)  As to the Wendy Lane searches, the court found that the probable cause and nexus elements were met when the evidence was viewed in its totality.  (*Id.* at 10-20.) It also found that the good-faith exception in *Leon* applied in each instance.  (*Ibid.*)  The court likewise upheld the search of Adams's home, concluding that, even if the executing IRS agents had impermissibly carried firearms, suppression would not be an appropriate remedy.  (A.App. 182-189.)  As with the Depot Street and Wendy Lane searches, the court found that the good-faith exception in *Leon* applied.  (*Id.* at 189.)

### b.     Motions to sever

Floyd and Dion also moved the court pretrial to sever their trials from Adams's.  (App. 149; D. Add. 14.).  They argued, *inter alia*, that (i) Adams's presence in a joint trial would enable the government to introduce evidence that otherwise would be excluded; (ii) a joint trial would preclude each defendant from offering the testimony of other defendants; and (iii) a joint trial would result in prejudicial spillover effects from Adams, a more avowed tax defier who seemed likely to testify.  Following a hearing, the district court denied those motions, finding no risk of prejudicial spillover effects sufficient to overcome the presumption in favor of trying alleged co-conspirators together.  (F.Add. 21-24.).[5]

### 2.     Trial, convictions, and sentences

Defendants were tried before a jury over 17 days.  The government produced numerous witnesses, including defendants' co-conspirators who pled guilty and government accounting experts, who explained the structure and operation of the payroll and warehouse

_____

[5] Defendants renewed their motions orally during trial and, in Dion's case, after trial (Doc. 451); the court denied each request.

banking schemes.  The government also introduced many exhibits, including Save-A-Patriot Fellowship membership agreements and client intake forms for the payroll scheme, establishing that defendants intended to obstruct the IRS.

Neither Floyd nor Dion testified; their defense consisted of opening statements, cross-examinations, and closing arguments designed to suggest that they were legitimate businesspeople who established legitimate companies and ran them for legal purposes. Adams, in contrast, did testify, and defended himself on the ground that his beliefs about the tax Code were held in good faith, even if they were mistaken.

At the conclusion of the evidence, the court, on the government's motion, dismissed Count Eight of the Indictment, *i.e.*, the tax evasion charge against Adams for 2004.  The jury returned verdicts of guilty on all remaining counts as to all defendants.   The court sentenced Floyd to 60 months' imprisonment and ordered her to pay $3 million in restitution.  (F.Add. 1-7.)  It sentenced Dion to 84 months' imprisonment and ordered him to pay $3 million in restitution.  (D.Add.

1-7.)  Finally, the court sentenced Adams to 48 months' imprisonment and ordered him to pay $400,001 in restitution.  (A.Add. 1-7.)

## SUMMARY OF ARGUMENT

Defendants Floyd, Dion, and Adams were tax defiers and members of the Save-A-Patriot Fellowship.  As members of the Fellowship, they signed a pledge to "resist[] and delay[] the tyrant at every step through the criminal investigation and all other agency and court proceedings feasibly possible."  (Exs. 142-A, -B, and -C.)  The evidence proved beyond a reasonable doubt that the defendants conspired to assist others in evading taxes by (i) establishing a payroll scheme that masked the identity of employers and employees while withholding no taxes, and (ii) creating a warehouse banking structure that prevented the IRS from tracing income and payments back to individuals.  Each defendant also committed individual tax violations.  They were duly convicted and sentenced to substantial prison terms.

1.  On appeal, true to their pledge, defendants offer a blizzard of arguments that signify nothing.  They first advance the untenable notion that there was insufficient evidence to support the jury's verdicts.  But the evidence clearly showed that each defendant profited

from the payroll scheme, a fact itself sufficient to uphold the verdicts on that count. There is more. Among other things, Floyd founded Contract America, the corporation underlying the payroll conspiracy, and she held several positions on its Board of Directors. Her signature also appeared on each of the thousands of checks that Contract America issued. Dion ran Talent Management, the "legitimate" and necessary counterpart to Contract America that allowed the scheme to function by permitting law-abiding employees to opt out of the criminal enterprise. Meanwhile, Adams recruited new clients for the scheme. Dion and Floyd were similarly culpable for the warehouse banking scheme: each profited, solicited new clients, and assisted in the creation of myriad front companies to stymie the IRS's attempts to parse the accounting fog that they created.

2. Defendants fare no better in arguing that the evidence against them should be suppressed due to deficiencies in various search warrants. Floyd and Dion protest the search of 44 Depot Street, the PT Resources office, on the ground that the manufacture of false IDs is not illegal, and therefore that no probable cause existed for the search. That assertion is specious: the creation of false government documents

is illegal, but more important, the warrants were issued because of the fraudulent representations made on PT Resources's website concerning the false IDs' legitimacy.  Evidence uncovered in that search and in an interview at Floyd's and Dion's home at 18 Wendy Lane led, quite reasonably, to a search of Wendy Lane, which in turn revealed evidence of the tax conspiracies and Adams's involvement therein.  And because suppression would not be the proper remedy for any impropriety from IRS agents carrying firearms during their search of Adams's residence, his argument fails.

3.  Floyd and Dion also contend that the district court erred in refusing to sever their trials from that of Adams.  Although Adams chose to testify and expound upon his tax-defier beliefs, while Floyd and Adams did not testify at all, the mere fact that the co-conspirators adopted antagonistic defense strategies was not enough to overcome the strong presumption that conspirators be tried together.  This case presented no exceptional prejudice; indeed, the district court repeatedly issued cautionary instructions explaining that certain evidence and testimony was admissible only against Adams, not against Floyd and Dion, and courts presume that juries follow their instructions.

4.  Floyd and Dion contend that their convictions under 26 U.S.C. § 7212(a) must be vacated because the Federal Register Act, 44 U.S.C. § 1505(a), requires implementing regulations to be published in the Federal Register and to be codified in the Code of Federal Regulations. This argument fails.  The plain language of the Act indicates that it applies only to executive orders, proclamations, and rules, not to Congressionally enacted criminal statutes.  Appellate courts have routinely rejected similar attempts to create loopholes in criminal law by alleging publication requirements.

5.  Dion's complaint that his sentence reflects an unwarranted disparity is unavailing.  His 84-month prison sentence is dramatically lower than the low end of the Guidelines range (121 months), and it accurately reflects his role as leader and organizer of the conspiracies. Dion was more culpable than his co-defendants.

6.  Finally, Adams gains no traction in arguing that the district court's cautionary instructions and final jury instructions improperly prejudiced his "good faith" defense.  In the cautionary instructions and in the extensive final instructions, the district court specifically and repeatedly explained that the jury could consider Adams's subjective

beliefs.  Although the court did not deliver certain of Adams's requested instructions as-written, the instructions it delivered were substantially similar.

The district court's judgments should be affirmed.

## ARGUMENT

### I

**The district court correctly found that there was sufficient evidence to support the jury's verdicts against Floyd and Dion**

**(Floyd Issue 3; Dion Issue 3)**

### Standard of review

Although this Court reviews *de novo* the district court's denial of a Rule 29 motion, it "assay[s] all the evidence in the light most amiable to the government, and take[s] all reasonable inferences in its favor [in determining whether] a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. Moran*, 312 F.3d 480, 487 (1st Cir. 2002).  In so doing, the Court "take[s] all inferences in the light most favorable to the verdict, [and gives] equal weight to both direct and circumstantial evidence." *Ibid.* (citations omitted).  In short, "[a]s long as the guilty verdict finds support in a plausible rendition of the

record, it must stand."  The Court has remarked, "[it] is a rare appellant who can mount a successful sufficiency attack in the face of these principles."  *Ibid.* (citations omitted).

——————————————

Oddly, Floyd and Dion's briefs leave until their third argument the suggestion that no rational finder of fact could have found them guilty.  (F.Br. 38-45; D.Br. 40-49.)  The jury's verdict, however, reflected the most reasonable view of the facts.

## A.    The evidence proved that Floyd and Dion participated in the payroll conspiracy.

Count One of the indictment (App. 21) charged Floyd and Dion with conspiring to defraud the IRS, in violation of 18 U.S.C. § 371, by promoting a payroll tax fraud scheme that assisted employers and many employees employed by those employers in evading taxes. Defendants claim (F.Br. 41; D.Br. 43) that they had "nothing to do with running any of the companies alleged to have perpetrated" the scheme. They assert (F.Br. 41-43; D.Br. 43-47) that Charles and Marie Adams ran Contract America without their participation or involvement.  Dion admits that he ran Talent Management, but claims that that company complied with all tax laws.  (D.Br. 44)  Contrary to defendants'

assertions, however, overwhelming evidence supported the jury's

verdict determining that Floyd and Dion conspired to defraud the

United States through the payroll scheme.

1. As an initial matter, Floyd and Dion shared in the profits from

the payroll conspiracy. Marie Adams testified that Dion and Floyd each

received one to two percent of the fees charged, which she conveyed to

them through Business Management Systems between 2001 and 2004.

See Supp.App. 121-22 (summarizing fees). This is strong evidence that

Floyd and Dion knowingly, intentionally, and willfully participated in

the conspiracy. *See United States v.* Torres, 604 F.3d 58 (2d Cir. 2010)

("[C]ircumstantial evidence of knowledge and specific intent necessary

to sustain a conviction must include some indicia of the specific

elements of the underlying crime," such as "recei[pt of] a share of the

profits from the conspiracy." (citation omitted)); *United States v. Huezo*,

546 F.3d 174 (2d Cir. 2008) (same). Not all conspirators need commit

an overt act in furtherance of a conspiracy. *See*, *e.g.*, *United States v.*

*Strickland*, 245 F.3d 368, 385 (4th Cir. 2001) (only "slight connection" to

the conspiracy need be proved to establish membership and

participation). Substantial payments to Dion and Floyd over the course

of years constitute clear evidence of membership and participation in the scheme.

2.  Of course, Floyd's and Dion's involvement in the payroll conspiracy extended far beyond the collection of fees.  Marie Adams testified that Dion was a co-founder of American Contracting Services (ACS), the predecessor to Contract America.  When Contract America was founded, Dion parted ways with ACS and brought his clients to Contract America.  For her part, Floyd took the laboring oar in incorporating Contract America.  (Supp.App. 29-36.)  She also opened and maintained the bank account for Contract America, and was the only signatory on the account.  And she empowered Charles and Marie Adams to write checks on the account by giving them a signature stamp bearing her name and authorizing them to use it on all Contract America checks written to employees.  As a result, every Contract America check drafted between 2001 and 2004 was signed under Floyd's name and with her permission, explicit or implicit.

3.  Trial testimony also established that both Floyd and Dion promoted the payroll conspiracy to potential clients.  *See United States v. Burgos*, 703 F.3d 1 (1st Cir. 2012) (for a conspiracy conviction, "the

evidence must establish that the defendant . . . in some since

promot[ed] [the conspiracy] himself, made it his own."). Gary and Scott

Alcock testified that Dion and Floyd pitched Contract America to Gary

Alcock as a way to make his payroll, and his business, disappear from

the IRS as well as from other creditors. (Supp.App. 174, 176-77.) The

Alcocks' testimony directly tied Dion and Floyd to the payroll

conspiracy.

4.    Moreover, Dion ran Talent Management, the cover-up

operation that was an integral part of the Contract America conspiracy.

While it is true that "Talent Management was managed in such a way

in which the proper withholding and payroll taxes were declared and

paid to the government" (D.Br. 44), this statement is both misleading

and irrelevant.

It is misleading because, although Talent Management paid taxes

and filed forms, it nevertheless operated illegally. Certain clients, such

as Gary Alcock, were concerned that their appearance as employers on

Forms W-2 might raise red flags with the IRS. Talent Management

circumvented this problem by issuing Forms W-2 on which it listed

itself as the employer, even though Talent Management actually

employed no one.  Because the Forms falsely omitted the real employer, a Contract America client like Gary Alcock was able to disappear from the IRS's radar.

Dion's statement concerning Talent Management's tax compliance is also irrelevant; Talent Management existed only to facilitate Contract America's efforts to assist clients in evading taxes.  *See United States v. Tzolov*, 642 F.3d 314, 320 (2d Cir. 2011) ("An overt act . . . need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." (citations omitted)).  Contract America enabled client companies to pay their workers while withholding no taxes and creating no paper trail. Certain employees, however, chose to comply with the tax laws; without an outlet like Talent Management that could assist such law-abiding employees, the employees might have alerted the IRS to Contract America's illegal operation by reporting wages from employees like Gary Alcock, who were not complying with the law.  Thus, even if Talent Management operated legally – which, as explained above, it did not – it nonetheless constituted an integral part of the payroll conspiracy, and one that Dion ran.

5.  Finally, there was sufficient evidence introduced at trial from which the jury could infer that Floyd and Dion acted with an unlawful purpose.  For example, a promotional brochure found in their house specifically stated that the purpose of Contract America was to not pay FICA and income taxes.  (Supp.App. 24-25.)  Likewise, in their Save-A-Patriot membership pledges, Dion and Floyd promised to thwart the IRS to the best of their ability.  (Supp.App. 38, 42.)  See also Supp.App. 68 (email from Charles Adams to Floyd explaining that Thomas Curry, a potential Contract America client, "is being chased by both IRS and MA [Department of Revenue]," but that he has "4 or 5 workers [who] are very loyal and could be trusted with this program (Contract America).").[6]

When viewing all evidence in the light most favorable to the prosecution, the jury's verdict was fully supported.

---

[6] Needless to say, individuals running a legitimate payroll company would have no need to inquire whether clients "could be trusted," yet that was the question defendants were asking.

**B.    The evidence proved that Floyd and Dion
participated in the warehouse-banking conspiracy.**

Defendants Floyd and Dion also claim (F.Br. 42-44; D.Br. 45-48)

that there is insufficient evidence to sustain the jury's verdict with

respect to Count Two, which alleged that they conspired to defraud the

United States through the promotion of a warehouse-banking scheme.

The evidence, however, overwhelmingly supports the jury's verdict.

Defendants' arguments on appeal focus almost entirely on their

alleged lack of material involvement with Calico Enterprises, the name

under which the warehouse-banking scheme operated beginning in

January 2003, which is when IRS Criminal Investigation agents

searched Floyd and Dion's Wendy Lane home.  But the warehouse-

banking scheme began long before 2003, doing business as Your Virtual

Office (YVO) and Office Services.  Just like Calico Enterprises, the

purpose of YVO and Office Services was to commingle millions of

dollars in assets owned by hundreds of companies and individuals, and

to enable those customers to make payments under the names of

nominee accounts such as Financial Factors and Mountain

Management, all while preventing "future disgruntled customers,

employees, or other libelous parties [from tying] up your assets

immediately with trustee or pre-judgment liens or a host of other colorable legal means." (Supp.App. 27-28.) In other words, no money in the commingled account could be traced to its true owner.

Defendants were canny enough to recognize that the authorities would see their appeals to potential clients for what they were: tailored solicitations to those seeking to evade taxes. As a result, defendants littered their promotional materials with defensive statements that seemed to anticipate an eventual lawsuit. See Supp. App. 28 ("We at The Virtual Office do not advocate evading any responsibility to pay your debts."); *ibid.* (customers are asked to state that YVO's services "are not being sought . . . . for the purpose of defrauding the United States of America or its Citizens.") At the same time, however, defendants assured potential clients that "[a]ll records maintained at Your Virtual Office are kept encrypted for your privacy and protection." *Ibid.*

The warehousing scheme was successful – Floyd and Dion processed more than $2 million in cashed checks through it (Supp.App. 91-120), and that success was built on knowingly recruiting clients who were tax evaders. YVO and Office Services advertised in the Save-A-

Patriot Fellowship newsletter, a publication targeted to tax defiers (Supp.App. 56), and the client-intake files found at the Wendy Lane residence confirmed that many prospective clients expressed plans to use the services to thwart the IRS.  For example, one client recounted that he had waged an 18-year battle with the IRS and was ready to start a new one with help of Dion and Floyd.  (Supp.App. 67.)

The warehouse-banking conspiracy continued unabated even after U.S. Postal Inspectors searched Dion and Floyd's Wendy Lane residence in January 2003.  Following that search, which uncovered extensive records of their participation in the warehouse banking scheme, Dion and Floyd merely transferred their clients to the newly formed Calico Enterprises, which they convinced Gail Thorick to manage on their behalf.   (Supp.App. 183.)  Thorick testified that Floyd and Dion came to her residence in Rhode Island after the January 2003 search, and asked her to accept the transfer of their Office Services clients into Calico, and to conduct the warehouse-banking operation through Calico. (Supp.App. 181.)  In light of the fact that Floyd and Dion lobbied and persuaded Gail Thorick to manage Calico, it is disingenuous in the extreme for Floyd to state (F.Br. 42) that she "had nothing to do with

running Calico Management's business," and for Dion to protest (D.Br. 48) that "Calico was the business of Gail Thorick and she ran it solely."

Although Thorick wished to keep the Calico Management operation small, Dion and Floyd directed increasing numbers of clients to her. (Supp.App. 184.) For example, Stephen Savage, an Office Services client, testified that, following the Wendy Lane search, Floyd directed him to continue with the warehouse-banking operation by working with Calico. (Supp.App. 186-87.) She said that it would be the best way to retrieve his money, which then was held up in a frozen Office Services account. (Supp.App. 187-88.) This evidence that defendants continued to promote the conspiracy even after the January 2003 search undercuts their claim of non-involvement in the scheme after that date.

A final aspect of defendants' involvement in the warehouse-banking scheme was Floyd's administration of BMS, which facilitated the warehouse-banking conspiracy by establishing and maintaining sham entities to give warehouse banking clients an added layer of concealment. For example, Gary Alcock testified that he met with Floyd and Dion at the BMS offices, and stated expressly that his goal

was to protect his assets from the IRS. (Supp.App. 176-77.) Floyd and

Dion hatched a scheme to "soak up" the equity in Alcock's company in

order to shield it from the IRS. Floyd used BMS to incorporate an

entity known as Alex Management Co.; she made herself President,

Treasurer, and Director, and Dion served as Secretary. Using Alex

Management, Floyd and Dion then put a lien on Alcock's company, with

the result that assets were shifted out of the IRS's reach; there was

never any legitimate attempt to satisfy Alcock's tax debt. (Supp.App.

178-79.)

In short, the evidence adduced at trial virtually compelled the

conclusion that Floyd and Dion willingly participated in the warehouse

banking conspiracy. Given the deferential standard of review afforded

jury verdicts, the convictions on Count Two should not be disturbed.

## C. The evidence proved that Floyd and Dion each corruptly endeavored to obstruct the IRS

Counts Four and Five of the indictment charged Dion and Floyd,

respectively, with corruptly endeavoring to obstruct and impede the

IRS's ability to determine their individual income and taxes, in

violation of 26 U.S.C. § 7212(a). Defendants contend (F.Br. 44-45; D.Br.

49-50) that there was insufficient evidence to sustain these convictions,

arguing that the government (i) failed to show that they had sufficient income to be required to file tax returns, and (ii) never audited them or otherwise alerted them that they should be paying taxes. (*Ibid.*)  Their arguments fall short on two levels.

First, defendants' arguments are legally irrelevant.  A violation of § 7212(a) requires no showing that a defendant had a duty to file a tax return based on a certain amount of income; such a showing instead is an element of the separate crime of failure to file a return, in violation of § 7203.  Section 7212(a) criminalizes efforts to interfere with the administration of the Internal Revenue laws – that is, interference with the IRS's ability to determine whether an individual owes taxes – an act independent of failure to file a return.  Similarly, a civil audit is not a prerequisite to any tax charge, let alone a section 7212(a) violation. Defendants' argument is essentially that the IRS had to catch them first and warn them to stop before bringing criminal charges.  But defendants' success in hiding their income is no defense to criminal charges.

Second, defendants' arguments fail on the facts; the record is clear here that Dion and Floyd did obstruct the IRS's ability to determine

their income.  There is no question that defendants were engaged in multiple businesses from which they earned substantial fee income; evidence showed they earned fees from Contract America, fees for setting up front companies through BMS, and fees for running the warehouse banking scheme.  (Supp.App. 123-130.)  The warehouse banking operation alone collected $28 million in deposits and cashed over $2 million in checks, and Dion and Floyd received a cut from each transaction.  (Supp.App. 91-120.)  They then commingled their own money with client money, making it virtually impossible for the IRS to trace their income.  (Supp.App. 89) (identifying Floyd and Dion as depositors in Mountain Management).  They also made extensive use of cash.  (Supp.App. 90.)  All of this was part of their corrupt endeavor to obstruct and impede the IRS's ability to determine their own income.

In sum, the jury reasonably convicted defendants based on the overwhelming weight of the evidence.

## II

### The district court correctly admitted evidence obtained during searches of defendants' properties

#### (Floyd Issue 1; Dion No. 1; Adams Issue 1)

#### Standard of review

The Court applies a mixed standard of review to challenges to a district court's denial of a motion to suppress. It "view[s] the facts in the light most favorable to the district court's ruling," and "reviews the district court's findings of fact and credibility determinations for clear error." *United States v. Camacho*, 661 F.3d 718, 723 (1st Cir. 2011) (citations omitted). In contrast, the Court reviews *de novo* the district court's probable cause determination and the district court's ultimate legal decision to grant or deny the motion to suppress. *Ibid.* (citation omitted).

———————————

### A.   The district court properly admitted evidence obtained during the search of 44 Depot Street

The investigation that ultimately uncovered defendants' tax conspiracies began as an inquiry into potential fraud from the manufacture and sale of false identifications. Defendants' briefs refer to the false identifications as "novelty IDs," but that innocuous term is

impossible to reconcile with the fact that PT Resources, defendants'
company, advertised the IDs as having been issued in compliance with
applicable international conventions.  (App. 66.)  In her detailed
affidavit, Postal Inspector Faulkerson recounted the myriad false
representations that PT Resources made with respect to the validity of
its IDs.  (App. 65-66, 77-78.)  She also explained that several undercover
purchases of false documents by the Postal Inspection Service and FTC
had traced mailings and funds to an office and mailbox located at 44
Depot Street.  (App. 68-77.)  Based on this information, the magistrate
judge issued a warrant to the Postal Service to search that address, and
the district court upheld the search against defendant's motions to
suppress.  (F.Add. 8-20.)

On appeal, Floyd (F.Br. 29-30) and Dion (D.Br. 30-31) identify two
alleged errors that they claim undermine probable cause.  Neither
withstands scrutiny.  Floyd and Dion first argue that the court erred in
finding probable cause to believe that PT Resources was committing a
crime, contending, "[i]t is not illegal to make fake or novelty IDs or to
sell them."  (F.Br. 29.)  As an initial matter, defendants are incorrect.
An International Driver's Permit is valid only if it is issued by or under

the authority of a country that is a party to the relevant United Nations
Convention (App. 67), and it is quite clearly a crime to produce a false
identification document that "appears to be issued by or under the
authority of the United States" (18 U.S.C. § 1028(a)).[7]  That is precisely
what PT Resources was doing.  More to the point, the government was
not pursuing charges of manufacturing false IDs; instead, it was
investigating possible fraud from defendants' misrepresentations about
the IDs' legitimacy.  The search was designed to uncover evidence of
that fraud.  The criminality of making a false ID is irrelevant to the
question whether defendants fraudulently marketed that ID.

Second, defendants point out that Faulkerson's affidavit relied in
part on an affidavit that Dion had sworn in a proceeding four years
earlier, an affidavit in which he had said that he did business out of the
office at Depot Street.  (App. 64-65.)  In their motions to suppress,
defendants argued that Dion's affidavit was stale and thus unreliable;
the district court reasonably disagreed.  As the court explained,
"here . . . you have an allegedly ongoing offense or continuing offense."

---

[7] As noted above, the United States has authorized only AAA to
issue international drivers permits.

The court opined that the continuing nature of the offense reduced the staleness risk, and concluded that, "under the circumstances here, . . . it is not sufficiently stale as to have lost its relevance." (F.Add. 12.) That factual determination was correct, and defendants offer no new perspective on appeal. The court properly admitted the evidence over defendants' objections.

### B. The district court properly admitted evidence obtained during the 2003 search of 18 Wendy Lane

The magistrate judge authorized the 2003 search of 18 Wendy Lane based on the same evidence that formed the basis for the search of 44 Depot Street, as well as additional evidence gathered when Agent Faulkerson visited Dion and Floyd at their home. (App. 86-90). Defendants (F.Br. 30-31, D.Br. 32) make the same arguments in support of suppression of the fruits of this search that they do with respect to the Depot Street search, *i.e.*, that making false IDs is no crime and that Dion's 1999 affidavit was stale. Those arguments fail for the reasons stated above.

### C.    The district court properly admitted evidence obtained during the 2004 search of 18 Wendy Lane

Unlike the 2003 searches of 44 Depot Street and 18 Wendy Lane, the 2004 search of 18 Wendy Lane was conducted by IRS criminal investigators and focused on the tax crimes for which Floyd and Dion ultimately were convicted.  The warrant application was supported by the affidavit of Special Agent David Toy (App. 96-148), which based probable cause on myriad sources of information, including, *inter alia*: (i) voluminous evidence gathered in the 2003 search of 18 Wendy Lane (App. 97); (ii) evidence gathered during a trash collection at 18 Wendy Lane earlier in 2004 (App. 130-133); (iii) Post Office records (App. 121-123); and (iv) a grand jury subpoena (App. 115-116).  The affidavit also referenced Special Agent Toy's considerable experience investigating tax fraud and tax protesters.

Floyd and Dion challenge the lower court's probable cause findings (F.Br. 31-32, D.Br. 32-33) on two grounds.  The first is a "fruit of the poisonous tree" theory, which rests on their challenges to the 2003 search of 18 Wendy Lane and 44 Depot Street.  That approach fails for the reasons discussed above; because those search warrants were issued

properly, the evidence obtained in the searches may properly support probable cause for the 2004 search.

Defendants' second tactic is to quarrel with the lower court judges' purported reliance on Agent Toy's experience.  Floyd's brief, for example, terms "conclusory" Toy's discussion of the common use of front companies and accounts – *i.e.*, ones without economic substance – in tax fraud schemes, and asserts that, "standing alone," Agent Toy's experience "cannot support a finding of probable cause."  (F.Br. 32.)  A moment's glance at Toy's 52-page affidavit, however, makes it clear that his inferences hardly "stand[] alone"; quite the contrary, they are buttressed by numerous `very specific facts.  For example, the affidavit describes (App. 120-123) defendants' use of multiple mail drops to make it more difficult for anyone to uncover the scope of their conspiracy.  These drops included post office boxes in Mendon and Plainville, Massachusetts, and street addresses in Mendon and Uxbridge, Massachusetts.  Having discussed the multiple addresses, Toy then remarked that, "[b]ased on my training and expertise as a criminal investigator, I believe that [defendants'] uses of multiple mail drops, post office boxes and nominees are evidence of their promotion of, and

participation in, the described scheme to evade Federal taxes." (App. 123.)

He offered his experience in other instances as well. For instance, he observed that evidence tied defendants to the Save-A-Patriot fellowship, and noted his "familiar[ity] with the Save-A-Patriot Fellowship" and experience that it "instructs its members on how to remove themselves from the tax system." (App. 124-125.)

The use of an affiant's expertise to supplement facts articulated in a search warrant application is a well established practice. *See*, *e.g.*, *United States v. Rodrigue*, 560 F.3d 29, 33 (1st Cir. 2009) (noting that warrant affidavit "included [deputy's] opinion, based on his training and expertise in investigating marijuana cultivation schemes, that drug traffickers commonly kept evidence of drug trafficking in their vehicles, at cultivation sites, or at their homes," and concluding that the judge "was entitled to give weight to the opinions of a trained investigator such as [the affiant]." The magistrate judge and district court here properly considered Toy's informed views of the significance of the voluminous facts in his affidavit.

**D.    The district court properly admitted evidence obtained during the search of 22 Madison Street**

Finally, Adams challenges (A.Br. 12-20) the search of his Madison Street home on the ground that IRS agents illegally carried firearms during the search.  Adams argued below in his motion to suppress that 26 U.S.C. § 7608(a) explicitly authorizes IRS agents to "carry firearms" when investigating crimes concerning subtitle E, which deals with liquor, tobacco, and firearms; in contrast, § 7608(b), which covers "laws relating to internal revenue," does not explicitly discuss firearms.  In Adams's view, the statute's silence with respect to carrying weapons in cases like this one is tantamount to forbidding it, and the proper remedy is suppression.

The district court correctly rejected this argument.  (A.App. 187-189.)  As an initial matter, the court correctly expressed doubt that there was any statutory violation.  Although section 7608(b) does not explicitly mention firearms, it does authorize agents "to execute and serve search and arrest warrants" (§ 7806(b)(2)(A)), and "to make arrests without warrant" if the agent "has reasonable grounds to believe that the person to be arrested has committed or is committing" an offense against the internal revenue laws" (§ 7806(b)(2)(B)).  As the

district court reasoned, "[i]t's difficult to believe that Congress intended that agents conducting arrests . . . in, let's say, drug money laundering cases would not be permitted to carry firearms." (*Id.* at 187.)  Courts have sensibly declined to interpret § 7806(b) to compel a result that would so confound law enforcement efforts.  The Seventh Circuit, for example, has observed that, "[l]ike many other criminal law enforcement agents, [IRS special agents] carry firearms and badges." *United States v. Peters*, 153 F.3d 445, 447 (7th Cir. 1998).   And the Internal Revenue Manual, which guides agents' actions, similarly instructs that "The General Counsel, Department of the Treasury, has concluded that no specific authority is necessary [to carry firearms during searches] because where a Federal officer has authority to make an arrest, he/she has implied authority to carry firearms."  IRM 9.1.2.4.1 (11-10-2004).   The agents here acted well within their authority.

Adams's argument for suppression also fails because suppression is not an appropriate remedy for a violation of § 7608.  The district court correctly recognized that the authority to carry weapons during a search is a statutory question, not a constitutional one; it remarked that

"I don't see how constitutional rights are involved at all by the carrying of a firearm in the course of executing a search." (A.App. 188.) By analogy, it noted that violations of the tax confidentiality statute, 26 U.S.C. § 6103, have not resulted in suppression of evidence. *Compare United States v. Caceres*, 440 U.S. 741, 757 (1979) (suppression not required for violation of IRS regulations); *United States v. Hensel*, 699 F.2d 18, 29 (1st Cir. 1983) (observing that the exclusionary rule is designed "to protect certain specific, constitutionally protected rights").

In his brief, Adams merely asserts (A.Br. 16-17) that a violation of § 7608(b) is a constitutional violation because it is a "factor" that can lead to a search being "unreasonable" under the Fourth Amendment; he notes that, in a case from 1970, this Court held that the IRS's failure to give taxpayers Fifth Amendment warnings before interviews constituted a due process violation. *See United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970). That analogy, however, fails because a failure to give constitutionally required warnings could lead to the gathering of evidence through self-incrimination. Here, in contrast, the executing agents had been authorized by a judge to search Adams's home, and to search it only for the items specifically enumerated in the attachment to

the warrant.  Whether or not officers were armed when searching could not conceivably turn a reasonable search into an unreasonable one; the same evidence would have been obtained in either case.

Ultimately, Adams's argument appears only to be that suppression is necessary to "deter police misconduct."  (A.Br. 18.)  But there was no misconduct here: the agents acted in good faith pursuant to a duly issued warrant, and in accordance with the Internal Revenue Manual.  Thus, even if a statutory violation occurred (which it did not), the evidence is admissible under the rule in *United States v. Leon*, 684 F.3d 897, 922 (1984) (evidence obtained in good faith by law enforcement officers relying upon a search warrant may be used in a criminal trial even if the warrant is subsequently deemed invalid).

## III

**The district court correctly denied Floyd and Dion's motions to sever their trials from that of Adams, an alleged co-conspirator charged in the same indictment.**

**(Floyd Issue 2; Dion Issue 2)**

### Standard of review

The Court reviews a district court's denial of a motion to sever for "manifest abuse of discretion."  *United States v. De La Paz-Rentas*, 613

F.3d 18, 23 (1st Cir. 2010) (citations omitted).  "[T]he presumption and common practice favor trying together defendants who are charged with crimes arising out of a common core of facts."  *Ibid.*

_____

Defendants Floyd, Dion, and Adams were charged in the same indictment.  (App. 14)  That instrument charged them with, *inter alia*, conspiring with one another to defraud the United States and IRS by obstructing the ascertainment and collection of taxes – that is, participating in the payroll conspiracy – in violation of 18 U.S.C. § 371.  (App. 21.)  Each defendant had a distinct role in that conspiracy: Dion formulated the scheme and transferred clients to Contract America from American Contracting Services, and also ran Talent Management; Floyd served as Contract America's president, treasurer, secretary, and director; and Adams promoted the scheme and aggressively sought out new clients.  All three defendants profited by sharing in the percentage fee that Contract America charged to process each payment.  (Supp.App. 171.)

Notwithstanding the three co-conspirators' deep entanglement, Floyd (F.Br. 35-38) and Dion (D.Br. 36-40) argue that the district court

erred in rejecting their motions to sever their trials from that of Adams.

They contend that: (i) Adams's tax-protester defense "was completely

antagonistic and irreconcilable" (F.Br. 35) with their position that they

had no illegal objectives; and (ii) Adams's presence tied Floyd and Dion

to the Save-A-Patriot tax protester organization despite the lack of any

other evidence doing so.  Each argument is unconvincing.

## A.    Severance is virtually never required in the context of an alleged conspiracy.

Courts strongly presume that "[p]ersons who are indicted together

should be tried together, since this practice helps both to prevent

inconsistent verdicts and to conserve resources (judicial and

prosecutorial)." *United States v. Catalan-Roman*, 585 F.3d 453, 461 (1st

Cir. 2009) (citation omitted).  Thus, "severance is particularly difficult

to obtain where, as here, multiple defendants share a single

indictment." *United States v. Page*, 521 F.3d 101, 109 (1st Cir. 2008)

(citation omitted).  What is more, "the preference for a joint trial is

particularly strong where the charge is conspiracy." *United States v.

Saunders,* 553 F.3d 81, 85 (1st Cir. 2009) (citations omitted).

This Court summarized the legal landscape confronting

defendants' position by declaring that, "[i]n the context of conspiracy,

severance will rarely, if ever, be required." *United States v. Flores-Rivera*, 56 F.3d 319, 325 (1st Cir. 1995).  Floyd and Dion do not address this presumption.  Indeed, it is telling that in the one case upon which defendants rely, *Zafiro v. United States*, 506 U.S. 534 (1993), the Supreme Court *affirmed the denial* of severance.  *Id.* at 539-540.  In so doing, the Court observed that "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Id.* at 538-539. In other words, one risk of engaging in a criminal conspiracy is that, at trial, co-conspirators may defend themselves in a manner inconvenient to each other's interests.

## B.   This unexceptional case provides no occasion to depart from the joint-trial presumption.

Floyd and Dion's primary argument in favor of severance (F.Br. 35-37, D.Br. 36-40) is that Adams defended himself in a manner that they considered prejudicial to their interests.  For example, Adams was the only defendant who chose to testify.  Moreover, whereas the lawyers for Dion and Floyd attempted to depict them as upstanding businesspeople with legitimate motives, Adams's defense acknowledged that he had failed to comply with the tax laws but argued that he had a

good-faith belief that those laws were inapplicable and invalid.  Without

more, however, the fact that various defendants offered different or

conflicting defenses is insufficient to mandate severance.  *See United*

*States v. Rose*, 104 F.3d 1408, 1415 (1st Cir. 1997) ("The Supreme Court

has held that conflicting defenses of co-defendants do not necessarily

require severance."); *United States v. Torres-Maldonado*, 14 F.3d 95,

105 (1st Cir. 1994) ("The fact that two defendants assert antagonistic

defenses does not, *per se*, require severance, even if defendants are

hostile or attempt to cast blame on each other."); *United States v.*

*Yefsky*, 994 F.2d 885, 896 (1st Cir. 1993) ("[M]ere antagonism of

defenses does not require severance.").

Floyd and Dion attempt to offer "more" by arguing that only

Adams's testimony tied them to the Save-A-Patriot (SAP) tax-defier

organization, which in turn caused them severe prejudice that could

have been avoided had their severance motions been granted.  *See* F.Br.

at 37 and D.Br. at 36 (asserting that "[t]here was minimal evidence of

any connection between [Floyd and Dion] and SAP and certainly

nothing as graphic or as riveting as Charlie Adams' testimony").  That

assertion is simply false; the government introduced signed SAP

membership agreements for Floyd and Dion, each of which stated that the signer was "in total agreement" with the Fellowship. See Exs. 142-A (Dion agreement), 142-C (Floyd agreement). Indeed, there was copious independent evidence tying them to the SAP movement. See, *e.g.*, Supp.App. 147-167 (discussing Contract America client intake forms filled out by Floyd, in which numerous would-be clients stated that they were SAP members and refused to pay taxes). There also was voluminous evidence of criminal intent, as discussed previously in addressing defendants' sufficiency arguments.

Finally, the district court gave clear cautionary instructions with respect to the evidence and testimony concerning Adams's beliefs, limiting consideration of that testimony to Adams alone. See, *e.g.*, Supp.App. 189 ("Just so it's clear, ladies and gentlemen, all of this evidence and testimony concerning the defendant's beliefs is, of course – you may consider it only as to Defendant Adams, not Defendants Dion or Floyd."). And it is well-settled that jurors are presumed to follow the instructions given by the district court. *Drumgold v.* Callahan, 707 F.3d 28, 66 (1st Cir. 2013). Indeed, this Court "ha[s] consistently derived comfort from the presence [of limiting jury instructions] when

appeals from severance denials come before [it]." *United States v.*

*Natanel*, 938 F.2d 302, 308 (1st Cir. 1991).

In sum, the district court properly exercised its discretion to try

the three co-conspirators together.

## IV

### The district court correctly rejected Dion's and Floyd's motions to dismiss one count of the indictment on the ground that the IRS had not issued implementing regulations.

### (Dion Issue 4; Floyd Footnote 1)

### Standard of review

The Court exercises *de novo* review over questions of law. *United*

*States v. Brennick*, 134 F.3d 10, 13 (1st Cir. 1998).

———————————

Dion and Floyd next contend (D.Br. 50-53; F.Br. 2 n.1) that their

convictions under 26 U.S.C. § 7212(a) must be vacated because there

are no implementing regulations in Title 26.  This argument – which

would suggest that every conviction under that statute has been

contrary to law – is nonsense.  Indeed, Dion's brief admits (at 52) that

"other Circuits have ruled against dismissing indictments" on precisely

the ground he urges.

Defendants contend that the Federal Register Act, 44 U.S.C. § 1505(a), requires additional implementing regulations to be published in the Federal Register and to be codified in the Code of Federal Regulations before 26 U.S.C. § 7212(a) can take effect.  This statutory argument fails.  First, the plain language of the Federal Register Act indicates that it applies only to executive orders, proclamations, and rules, not to Congressionally enacted criminal statutes.  *See United States v. Walls*, 546 F.3d 728, 740 (6th Cir. 2008) (discussing Federal Register Act and holding that "44 U.S.C. § 1505(a) does not apply to criminal statutes passed by Congress"); *United States v. Schiefen*, 139 F.3d 638, 639 (8th Cir. 1998) (same).

Second, the criminal prohibitions of 26 U.S.C. § 7212(a) (1954) predate the publication requirements of 44 U.S.C. § 1505(a) (1968), the latter of which contains no explicit statement that Congress intended to repeal all prior criminal statutes.

Third, as Dion concedes, appellate courts have routinely rejected similar attempts to create loopholes in criminal law by alleging publication requirements.  *See*, *e.g.*, *Hicks*, 947 F.2d at 1359; *United States v. Bowers*, 920 F.2d 220, 221-23 (4th Cir. 1990) (rejecting

defendants' argument that their convictions were invalid for failure to publish in Federal Register pursuant to 5 U.S.C. § 552, and affirming tax evasion convictions).

Defendants' convictions under 26 U.S.C. § 7212(a) must stand.

## V

### Dion's sentence reflected no unwarranted disparity.

### (Dion Issue 5)

### Standard of review

This Court reviews a defendant's sentence for abuse of discretion. *United States v. Thurston*, 544 F.3d 22, 25 (1st Cir. 2008).

—————————————————

Dion next argues (D.Br. 53-55) that his 84-month sentence of incarceration (D.Add. 2) was unduly high compared to that of the other defendants charged in the indictment.  Floyd, for example, received a 60-month sentence, and Adams received 48 months of imprisonment. (F.Add. 2; A.Add. 2.)  Dion's contention is without merit.

It is first important to note that Dion's sentence already reflects considerable leniency.  The district court found that the intended tax loss attributable to Dion was at least $3 million: $300,000 for Contract America, and $2.7 million for the warehouse scheme.   (Doc. 510 at 124.)

That led to a Base Offense Level of 24. U.S.S.G. § 2T4.1. The court

then imposed a 4-level adjustment for leader-organizer role, pursuant to

§ 3B1.1; a 2-level adjustment for use of sophisticated means, pursuant

to § 2T1.1(b)(2); and a 2-level enhancement for encouraging others to

violate the law, pursuant to § 2T1.9(b)(2). (*Id.* at 125-126.) (*ibid.*).

Application of these three enhancements totaling 8 levels brought the

Adjusted Offense Level to a Level 32. Dion had a Criminal History

score of zero, which yielded a Guidelines range of 121 to 151 months.

(*Id.* at 129.) The government requested a sentence in the Guidelines

range, *i.e.*, at least 121 months of imprisonment. (*Id.* at 138.) The

district court, however, imposed a sentence of only 84 months,

acknowledging that there are "intelligent arguments in both directions"

with respect to the proper sentence. Doc. 510 at 163.

Apparently dissatisfied even with a sentence three years shorter

than that recommended by the Guidelines, Dion protests that his

sentence was higher than that of Floyd and Adams. There are good

reasons for the difference. For example, neither Floyd nor Adams was

deemed to be a leader or organizer of the offense: Floyd received only a

3-level enhancement for being a manager (compared to Dion's 4-level

enhancement) (Doc. 579 at 35), which meant that her Adjusted Offense Level was 31, rather than 32 (*id.* at 16-17). Adams had the same adjustments as Floyd, but because he was not alleged to have taken part in the warehouse scheme, his intended tax loss did not include the $2.7 million from that scheme and instead totaled between $400,000 and $1 million (Doc. 589 at 13), which yielded an Adjusted Offense Level of 27. As one would expect given these Adjusted Offense Levels, Floyd's sentence of 60 months was lower than Dion's sentence of 84 months, and Adams's sentence of 48 months was the lowest of the three.

In sum, the district court treated Dion reasonably compared to his co-defendants and leniently from the perspective of the Guidelines. No material comparison can be drawn with the sentences imposed on Marie Adams, Gail Thorick, Myron Thorick, Gary Alcock, or Scott Alcock (D.Br. 54. Unlike Floyd and Dion, none of these others defendants was involved in both conspiracies; in fact, the Alcocks were mere customers of the schemes. And most important, each of these other individuals cooperated with the government and testified against Floyd, Dion, and Adams. *See United States v. Flores-Machicote*, 706 F.3d 16, 24 (1st Cir. 2013) (disparity "in sentencing outcomes may rationally be attributed

to, say, differences in criminal history, the presence or absence of cooperation, or a myriad of other factors"); *United States v. Cirilo-Munoz*, 504 F.3d 106, 142 (1st Cir. 2007) (defendant who goes to trial is not identically situated with defendant who cooperates).

## VI

**The district court reasonably issued cautionary instructions during Adams's testimony and properly instructed the jury with respect to Adams's "good faith" defense.**

### (Adams Issue 2)

### Standard of review

"Review as to instructions is ordinarily *de novo* as to question of substantive law, while issues of phrasing and emphasis are reviewed for abuse of discretion." *United States v. Allen*, 670 F.3d 12, 15 (1st Cir. 2012) (citation omitted). "Refusal to give a particular instruction requires reversal only where the requested instruction was both substantively correct and not substantially covered elsewhere in the charge – and even then only when the error was not harmless." *United States v. Gonzalez*, 570 F.3d 16, 21 (1st Cir. 2009).

———————————

Adams alleges (A.Br. 18-24) two types of errors in the district court's instructions to the jury: first that the court's instructions with respect to Adams's testimony were unduly prejudicial, and second that the jury instructions improperly eliminated Adams's "good faith" defense. Neither contention is tenable.

### A. The district court's instructions during Adams's testimony were necessary and proper, and they allowed Adams to testify without confusing the jury as to the law.

Adams was a tax defier whose role in the payroll conspiracy was to recruit new members by persuading them that the tax laws were invalid. From the beginning, he telegraphed his intention to hold forth at great length to the jury, perhaps in an attempt to convince them of the same thing. The district court made it clear that it would not indulge that tactic; when Adams's counsel predicted that he "could be testifying for several days, if not several weeks," the court responded, "[n]o one is going to testify for several weeks." (A.App. 214.) And, from the very outset of the trial, the district court issued cautionary instructions to ensure that the jury would take its understanding of the law from the court, not the litigants. For example, when it admitted

defendants' signed Save-A-Patriot Fellowship membership agreements,

which espoused tax-defier ideals, the court said (A.App. 216):

> Ladies and gentlemen, just to remind you, some of the materials that you have in front of you are going to discuss legal issues.  I'm permitting this into evidence for whatever it may bear on the defendants' knowledge and intent.  You should not take any of this information as necessarily an accurate statement of the law.  Again, you're to take the law from my instructions, including on all tax issues, but you may consider this information for whatever weight you choose to assign it in considering, again, what the defendants knew or understood concerning the law.

Although Adams mentions this exchange in his brief (at 21), he did not

object to it at the time, nor did he object to many similar cautionary

instructions that the court issued throughout trial in order to parse

Adams's alleged beliefs from accurate statements of law.  See, *e.g.*,

A.App. 249, 251, 252, 253, 254, 255.  Such clarifying instructions are

routine and proper.

The gravamen of Adams's complaint is that, during his testimony,

the court on several occasions reminded the jury that a statement is

"not an accurate statement of the law but I will allow it as a statement

of the defendant's stated belief."  (A.App. 253.)  See also App. 254

(allowing a statement as a reflection "of [Adams's] belief, not an

accurate statement of the law.").  Adams apparently believed these

instructions to be prejudicial in the aggregate, but again, he did not

object to most of them.  Instead, he simply objected once, on the ground

that they were "getting repeated so many times."  (App. 250.)  The court

explained that it was simply doing its best with a difficult situation, and

that it "ha[d] to correct him periodically."  (*Ibid.*)

Adams makes no serious argument that the district court

committed reversible error by giving too many curative instructions, nor

could he convincingly protest this paradigmatic exercise of discretion.

Instead, he chiefly complains that the curative instructions prejudiced

his "good faith" defense, *i.e.*, his alleged subjective belief that he was

complying with the law.  But by their very terms, the instructions did

no such thing.  Quite the contrary, they explicitly acknowledged that

defense.  See A.App. 216 ("I'm permitting this into evidence for

whatever it may bear on the defendants' knowledge and intent"); A.

App. (allowing statement as a reflection "of [Adams's] belief.").  Adams

was not precluded from presenting his defense to the jury; the trial

court acted correctly.

## B. The final jury instructions properly presented and allowed the jury to acquit on Adams's claimed "good faith" defense

Adams submitted his desired jury instructions with respect to "good faith" (App. 205) and "willfulness" (App. 207), which he complains the district court did not deliver as offered. But that is not the operative question; the issue is whether the requested instructions were "substantially covered elsewhere in the charge." *Gonzales*, 570 F.3d at 21. They were. With respect to good faith and willfulness, the court instructed the jury at length, and specifically addressed the subjective nature of belief that the government must prove. It explained, in relevant part (Supp.App. 190-92):

> Each defendant's intent must be determined by a subjective standard: that is, you must decide what a particular defendant actually knew and believed, not what a reasonable person in his position should have known or believed.
>
> \*    \*    \*
>
> If a defendant acted through mistake, accident, ignorance, or neglect – for example, if he did not know the requirements of the law, or did not know that the law applied to him – he did not have the required knowledge or intent. A good-faith but mistaken belief as to what the tax laws require is not enough to have the required knowledge and intent.
>
> A good-faith belief is one that is honestly held. A person may honestly hold a mistaken belief without committing a crime.

-68-

Adams makes no attempt (A.Br. 19-20) to explain what valid element of his defense these extensive instructions did not "substantially cover[]." *Gonzalez*, 570 F.3d at 21. There is none. To the extent that the instructions as delivered diverged from Adams's preferred language, that choice of phraseology lies within the district court's discretion, which it exercised soundly.

## CONCLUSION

For the reasons discussed above, the judgments of the district court should be affirmed.

Respectfully submitted,

KATHRYN KENEALLY
  *Assistant Attorney General*

/s/ Damon W. Taaffe

FRANK P. CIHLAR                 (202) 514-5396
  *Chief, Criminal Appeals &*
  *Tax Enforcement Policy Section*
GREGORY VICTOR DAVIS            (202) 514-5396
DAMON WILLIAM TAAFFE            (202) 514-5396
  *Attorneys, Tax Division*
  *Department of Justice*
  *Post Office Box 502*
  *Washington, D.C. 20044*

*Of Counsel:*
CARMEN M. ORTIZ
  *United States Attorney*

SEPTEMBER 2013

# CERTIFICATE OF COMPLIANCE

With Type-Volume Limitation, Typeface
Requirements, and Type Style Requirements

Case No.   12-2229, 12-2231, 12-2276

    1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

       [X]  this brief contains   12,724   words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

       [ ]  this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

    2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

       [X]  this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century Schoolbook, *or*

       [ ]  this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

(s)   Gregory Victor Davis

Attorney for   United States

Dated:   Sept. 23, 2013

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2013, I, Damon William Taaffe, Attorney, Department of Justice Tax Division, certify that I served a copy of the foregoing document on the following registered participants of the CM/ECF system.

Joan M. Griffin, Esq.,
P.O. Box 133
Dublin, NH 03444
(Attorney for Catherine Floyd)

John M. Goggins, Esq.
46 Wachusett Street
Worcester, MA 01609
(Attorney for William Scott Dion)

Beverly B. Chorbajian
390 Main Street
Worcester, MA 01608-2501
(Attorney for Charles Adams)

  /s/ Damon W. Taaffe
DAMON TAAFFE
*Attorney, Tax Division*